**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

———————————

UNITED STATES OF AMERICA,

      Plaintiff,

  v.                                       17-CR-1723-WJ

ETHAN GUILLEN,

      Defendant.

### <u>MEMORANDUM OPINION AND ORDER</u><br><u>GRANTING IN PART AND DENYING IN PART</u><br><u>DEFENDANT'S MOTION TO SUPPRESS EVIDENCE AND STATEMENTS</u>

THIS MATTER comes before the Court upon the Motion to Suppress Evidence and Statements Discovered as a Result of Unlawful Search and Seizure, filed September 13, 2017 by Defendant Ethan Guillen (hereinafter "Defendant" or "Ethan") **(Doc. 31)**. Having reviewed the relevant pleadings of the parties, having considered the testimony and evidence presented at the suppression hearing and having considered the oral and written arguments of counsel, the Court denies the motion as to the lawfulness of the entry into the residence and the search, and denies Defendant's request to suppress physical evidence seized as a result of the search. The motion is granted only to the extent that Defendant's initial self-incriminating statement to law enforcement is suppressed, but the motion is denied in all other respects.

The Court held a three-day hearing on the motion on January 18, 19, and 25, 2018, and the parties were given the opportunity to submit written closing arguments, which they have done. **(Docs. 62 and 63)**. A hearing was held on Monday, April 16, 2018 for oral argument on the written closing arguments. In their written closings, the parties tendered what amounted to

requested findings of fact by referring to the transcripts from the hearing, and submitted what amounted to conclusions of law. The Court notes that the facts are largely undisputed although the parties disagree on the legal significance of those facts (for example, whether Defendant was in custody for purposes of *Miranda*), but the Court will also note where the facts are disputed (for example, whether Defendant gave verbal consent to law enforcement to enter the home).

## BACKGROUND

Defendant's motion seeks suppression of all evidence and statements made by Ethan derived from the alleged illegal search of his home and effects, and from unlawful seizure and interrogation. According to the criminal complaint, on May 31, 2017, law enforcement responded to a 911 call which came in around 3:00 p.m. from someone who was later identified as Defendant's ex-girlfriend, "MC." MC had found an explosive device (a pressure cooker bomb) under her bed. A timer was used to turn on a soldering iron that was to heat up and start the fuse which then was to ignite the pressure cooker bomb. Fortunately the bomb did not detonate. The Albuquerque Police Department ("APD") Bomb Squad was inspecting the device at MC's home when Special Agent Zachary Rominger ("SA Rominger") arrived.[1] The pressure cooker held approximately six pounds of black powder, nuts, bolts and a rubbery-like substance in a plastic bag that was later identified as "homemade napalm." Law enforcement concluded that the pressure cooker and its contents were an improvised explosive device ("IED"). SA Rominger interviewed MC and her mother about MC's past relationship with Ethan. MC explained she had dated Ethan for about six months, and after breaking up in June 2016 she made it clear she wanted no further contact with him, but he continued to try and communicate

---

[1] SA Rominger is an agent with the Federal Bureau of Alcohol, Tobacco and Firearms.

with her.  For a while, the school provided her with an escort to class in an effort to stop Ethan's harassment.

After interviewing MC, four law enforcement officers went to Defendant's home at around 9:43 p.m. that same day.[2]  Of the four officers, only APD Detective Larranga had a lapel camera video and had the good sense to have the device turned on recording events that were occurring.  The Court notes that J. Edgar Hoover died in 1972 so perhaps the time has come for federal law enforcement agencies such as the FBI and the ATF to follow the lead of other law enforcement agencies such as the APD and require agents to record most of their encounters with members of the public.  Recording such encounters assists trial judges in making factual findings.

The officers did not have a warrant to search Defendant's house.  When agents knocked on the front door, Ethan and his brother Tyler Guillen ("Tyler") opened it. Upon entry the officers conducted a protective sweep of the house, but no evidence was collected at this time. Defendant contends that the entry was illegal because Ethan did not consent to the entry either verbally or nonverbally.

Reynaldo Guillen ("Mr. Guillen"), Ethan's father, returned home about 18 minutes from the time the agents entered the home and was interviewed by the agents about a pressure cooker and a soldering iron.  Reynaldo said he recently bought a pressure cooker for Ethan and he asked Ethan where it was.  Ethan told Reynaldo that it was at his mother's house, but a call to the mother revealed that she did not have it.  Reynaldo had several conversations with his ex-wife Lori Valdez ("Ms. Valdez") that evening in order to determine whether she had the pressure cooker.  Ms. Valdez said she did not know but would have to look, and at the hearing she

[2] The four officers present at Defendant's home were SA Rominger, ATF SA Wright, FBI Special Agent Bomb Technician (SABT) Green, FBI SABT Anthony, and APD Detective Larranaga.

testified that she did not look for the pressure cooker that evening. Tr. at 475. Ethan then changed his story and said the pressure cooker was at the home of his recently deceased uncle.

Mr. Guillen consented to a search of the residence and signed a search consent form. Defendant at no time objected to the search. The search did not uncover the soldering iron which Mr. Guillen said he owned, but in the backyard agents found a white plastic table with large burn marks on it and a piece of fuse stuck on it.[3] Agents found a backpack next to the bed, which contained white duct tape (which matched the duct tape found on the IED), black duct tape, latex gloves, scissors, super glue and zip ties.

SA Rominger questioned Ethan at the kitchen table for about 50 minutes, during which time Ethan denied having any involvement with making the device. SA Rominger then told Ethan that the evidence indicated that he had made the IED, and Ethan stated, "Yes, I made it." At that point, SA Rominger read Defendant his *Miranda* rights. Ethan acknowledged that he understood those rights and waived them and agreed to speak with both SA Rominger and SA Greene. Defendant explained how he constructed the IED, entered MC's apartment through the back door of her balcony while MC was out and plugged the IED into a timer set for 1:30 a.m. Ethan's post-warning statements were recorded by Det. Larranaga's lapel camera. Ethan described how, after putting the device in place, he then listened to a police scanner and waited to hear about an explosion. Ethan told SA Rominger that he wanted MC dead and that he did not care that the explosion could have injured or killed nearby people. The agents followed Ethan into his room where Ethan showed them his computer and the components he used for building the IED which were in his backpack, including the white duct tape, the gloves and the super glue.

---

[3] Shortly after the search began, Mr. Guillen was asked about a soldering iron and whether he owned one or possessed one, and he said that he did. He went with agents into the garage and was unable to find it. Tr. at 61, 341-342.

The complaint states that officers were unable to locate both a pressure cooker and a soldering iron which had been purchased by Mr. Guillen, but information about the pressure cooker and soldering iron was obtained as a result of the agent speaking with Ethan at the house. In discovery, ATF agents disclosed that these additional items were later obtained from Ethan's bedroom:

- backpack with contents
- desktop tower computer,
- laptop computer,
- X-Box
- J.B. Weld (an epoxy product) from the nightstand, and
- A cell phone from Ethan Guillen's person

Agents also disclosed in discovery that certain items were obtained from the backyard of the residence, including:

- A plastic table (with large burns on its surface),
- A tube of caulk
- A caulking lid
- An empty bottle of isopropyl alcohol
- A burned match box and
- A burned razor blade

## DISCUSSION

The Fourth Amendment requires that searches and seizures be reasonable. *City of Indianapolis v. Edmond*, 531 U.S. 32, 37 (2000). It is a "basic principle of Fourth Amendment law" that searches and seizures inside a home without a warrant are presumptively unreasonable. *Payton v. New York*, 445 U.S. 573, 586 (1980). The Fourth Amendment "applies equally to seizures of persons and to seizures of property," *Payton v. New York*, 445 U.S. 573, 585 (1980), and only prohibits searches and seizures that are unreasonable. *City of Indianapolis v. Edmond*, 531 U.S. 32, 37 (2000). In *Terry v. Ohio*, the Supreme Court held that a seizure occurs and the Fourth Amendment applies "whenever a police officer accosts an individual and restrains his

freedom to walk away." 392 U.S. 1, 16 (1968); *United States v. Broomfield*, 201 F.3d 1270, 1274 (10th Cir. 2000) (a seizure occurs when the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter).

As long as "a reasonable person would feel free to disregard the police and go about his business, the encounter is consensual and no reasonable suspicion is required." *Florida v. Bostick*, 501 U.S. 429, 434 (1991). "[I]n order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." *Broomfield*, 201 F.3d 1270 at 1274; *see also United States v. Mendenhall*, 446 U.S. 544, 554-55 (1980) ("Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.").

For purposes of this discussion, the Court will refer to the transcripts for the motion hearing by their page numbers. Volume 1 includes pages 1-202; volume 2 includes pages from 205-471 and volume 3 runs from pages 473-506.[4]

I.      **Entry Into House and Protective Sweep**

In the motion to suppress, Defendant argues that his Fourth Amendment rights were violated when agents physically intruded into the Guillen home because Tyler expressly

---

[4] The three volumes are docketed as Docs. 57, 58 and 59, but the page numbers refer to the actual pages of the transcript rather than to the page numbers corresponding to the docketed pleading. Where the parties do not take different positions on the facts, those facts will be stated without reference to the transcript.

consented to the entry but Ethan did not.  Defendant also suggests that any consent that might have been given was not voluntary because there was a show of force by the presence of four detectives seeking entry into the house.[5]

Detective Larranaga captured the moments leading up to the agents' entry into the house on his lapel camera ("lapel cam video"), and the video was admitted as an exhibit at the initial hearing on the motion to suppress.  Ex. 1, Part 2.  The Court has reviewed this video numerous times, in preparing for the motion hearing as well as during the hearing.

The parties differ on whether Ethan gave consent for the agents' entry into the home. The Government's position is that Ethan ultimately did give express permission for the entry, although he initially objected.  Both brothers opened the front door and the agents asked if they could come inside and talk.  Tyler agreed, but Ethan asked if the agents had a warrant.  Agent Greene advised him that they did not, and Ethan asked if they could talk outside instead.  When the agents asked again if they could come inside, both brothers appeared to be having some discussion, most of which was inaudible on the video, and then Ethan stepped aside and said "Sure" in response to Agent Green's question, "Are you inviting us in"?

The events surrounding the entry were described consistently by SA Rominger (Tr. at 28-30); SA Green (Tr. at 215-216).  Neither agent had any doubt that Ethan as well as his brother Tyler gave consent for the entry; Det. Larranaga (Tr. at 306-07) stated that he could not see which brother's lips were moving to say "Sure" but it sounded to him as though Ethan made that statement. The Court finds the agents' testimony to be credible.  Ethan asserts that he objected to the entry, but was overruled by his older brother, who shoved Ethan aside to allow the agents to

---

[5] At the hearing, SA Rominger described what was occurring in Det. Larranaga's lapel cam video: Det. Larranaga can be seen approaching the Guillen resident from the east side of the street, and what was not visible on the video was SA Rominger, SA Wright, and two FBI agents parked to the west who also approached the residence from that direction. Tr. at 25.

enter the home. Tyler testified at the hearing that he—not Ethan—gave express permission to law enforcement to enter the house. He stated that he had asked Ethan why he cared whether the officers came into the house, and Ethan told him that he would "prefer them not to come in" but that he brushed off his brother's comments. Tr. at 363.

The Court has viewed the lapel cam footage capturing the agents' entry into the Guillen residence several times, and finds this footage crucial to the Court's determination on this issue. The discussion between the two brothers was inaudible, but after repeated viewings, it appears that Ethan said "Sure" to the agents' second request to come inside, taking a step back while Tyler stepped off to the side in order to allow the agents to come in. *See United States v. Guerrero*, 472 F.3d 784 (10th Cir. 2007) (a defendant's consent must be clear, but it need not be verbal). While it was difficult to discern whose mouth was moving, Ethan's posture and body language was consistent with finding that Ethan did give express permission for the entry affirmatively, both orally and by his actions in stepping aside. This is consistent with the officers' testimony. Defendant's contention that Tyler shoved Ethan aside is not visible in the video. The videotape shows that both brothers gave oral consent, and both cleared the way for the agents to enter. The Fourth Amendment recognizes a valid warrantless entry and search of premises when police obtain the voluntary consent of an occupant who shares, or is reasonably believed to share, authority over the area in common with a co-occupant who later objects to the use of evidence so obtained. *Illinois v. Rodriguez,* 497 U.S. 177 (1990); *United States v. Blunt*, 187 F. App'x 821 (10th Cir. 2006) (warrantless entry into drug suspects' residence did not violate Fourth Amendment, where third party with apparent authority to enter residence invited officer to accompany her inside).[6] In this case, there is no evidence or testimony that Ethan ever

---

[6] *U.S. v. Cruz-Mendez*, 467 F.3d 1260, 1265 (10th Cir. 2006) (district court did not err finding that entry was lawful where girlfriend gave consent to enter and invited officers inside after she retrieved identification); *see also U.S. v.*

objected to the entry, even after the agents were in the house—except for his initial objection when he asked the agents if they had a search warrant, which Ethan withdrew when he stated "Sure." A lack of objection on Ethan's part to the officers' entrance into the house, and later to the search, indicates consent. *See United States v. Espinosa,* 782 F.2d 888, 892 (10th Cir.1986) (failure to object "may be considered an indication that the search was within the scope of the consent"); *United States v. Pena*, 143 F.3d 1363, 1368 (10th Cir. 1998) (accord).

The Court also rejects Defendant's argument that even if Ethan consented to the entry, his consent was involuntary because of a show of force by the law enforcement agents standing outside the door. Consent is determined through a totality of the circumstances. *United States v. Dewitt*, 946 F.2d 1497, 1500 (10th Cir. 1991). For a consent to be valid: "(1) There must be clear and positive testimony that consent was unequivocal and specific and freely given; and (2) The government must prove consent was given without duress or coercion, express or implied." *United States v. Butler*, 966 F.2d 559, 562 (10th Cir. 1992). Factors relevant to whether a consent was voluntary include: whether officers touch or physically restrain defendant; whether the officers are in uniform or plain clothes; whether their weapons are displayed; whether there are a large number of officers; whether the officers use a harsh tone or demeanor; and whether they have advised the defendant of his or her right to terminate the encounter or refuse consent. *United States v. Zapata*, 997 F.2d 751, 756–57 (10th Cir. 1993). An individual also may consent through physical conduct. "Consent may instead be granted through gestures or other indications of acquiescence, so long as they are sufficiently comprehensible to a reasonable officer." *United*

---

*McKerrell*, 491 F.3d 1221, 1227 (10th Cir. 2007) (an occupant who does not wish the search to occur must expressly object in order to nullify a co-tenant's express consent) (search context); *cmp. Georgia v. Randolph*, 547 U.S. 103, 106 (2006) (physically present co-occupant's stated refusal to permit entry renders warrantless search unreasonable and invalid as to him).

*States v. Guerrero*, 472 F.3d 784, 789–90 (10th Cir. 2007). The characteristics of a defendant may also be taken into account as well. *U.S. v. Dozal,* 173 F.3d 737, 796 (10th Cir. 1999).

While the number of officers present may be a factor to consider for voluntariness, it is not the only factor to consider. *See, e.g., United States v. Jones*, 701 F.3d 1300, 1314 (10th Cir. 2012) (while there were three officers on the scene, the testimony presented indicated that the officers' presence was non-threatening and thus under a totality of circumstances, a reasonable person would feel free to go about one's business during the encounter). Based on the pleadings and the evidence and testimony at the hearing, the Court finds no indication that the officers behaved in a coercive or threatening manner. The agents' request to enter the home was made twice, and was done in even tones and without raised voices. There was no menacing insistence in either of the requests. Most of the agents were in plain-style clothes and weapons were concealed. Tr. at 37-38. Ethan points to his characteristics as a youth who was allegedly clinically depressed and taking antidepressant medication, having no prior law enforcement contacts or juvenile history, and being overruled by his brother Tyler who is physically stronger and larger. However, the agents would not have either known or seen any of this, and this was certainly not obvious from the videotape from Det. Larranaga's lapel cam video.

Therefore, under the totality of the circumstances, it was reasonable for the agents to believe that consent to enter the home was freely given by both brothers. Accordingly, the entry did not violate Defendant's Fourth Amendment rights.

B.    <u>Protective Sweep</u>

In the motion to suppress, Defendant claims that the video shows that only Tyler consented to the protective sweep conducted by Det. Larranaga and that Ethan at no point consented to a sweep of the house either verbally or with his behavior. Here again, Ethan did not

object to the sweep, nor is there any suggestion that the protective sweep was not done on legal grounds. Also, no evidence was gathered as a result of the sweep. There was no testimony or evidence rebutting SA Rominger's explanation for the security sweep, which was done immediately after the agents entered the Guillen residence. Tr. at 30 (SA Rominger stating that agents conducted protective sweep in order to ensure that "nobody is going to come up on you while you're doing an interview or while you're talking."). *See U.S. v. Owens,* 782 F.2d 146, 151 (10th Cir.1986) (a protective sweep is "appropriate only where officers reasonably perceive an immediate danger to their safety"). In this case, law enforcement had a legitimate interest in ensuring that the officers' lives would not be at risk if there were other bombs in the house, in light of the information that had obtained from the interview with the victim. Therefore, the agents did not violate Ethan's Fourth Amendment rights when they conducted a protective sweep.

## II.     Search of the Residence and Bedroom

Defendant contends that his Fourth Amendment rights were violated when law enforcement agents conducted an unreasonable search of his home and its curtilage, his bedroom, and his backpack. He contends that he had an expectation of privacy in those places and things.

Law enforcement officers may search a home without a warrant with the voluntary consent of the homeowner. *U.S. v. Pikyavit,* 527 F.3d 1126, 1130 (10th Cir. 2008). Whether voluntary consent was given is a question of fact determined by the totality of the circumstances. *Id.* The government must "proffer clear and positive testimony that consent was unequivocal

and specific and freely given . . . and must prove that this consent was given without implied or express duress or coercion." *U.S. v. Zubia Melendez,* 263 F.3d 1155, 1162 (10th Cir. 2001).[7] The facts relevant to the search issue are undisputed. Upon entry into the house, the agents were informed that Mr. Guillen, a musician, was in Santa Fe. While the security sweep was being conducted, SA Rominger and SA Green asked Ethan if they could talk at the kitchen table and other agents were talking with Tyler in the back hallway. Around 10:00 p.m., Mr. Guillen returned home. Mr. Guillen was the owner of the home, and he provided oral and written consent to the search of the residence. Defendant does not expressly challenge the validity of Mr. Guillen's consent relative to his signing the consent form. At the hearing, Mr. Guillen testified that he did not understand he had a right to refuse to consent to the search of the house. However, there is no evidence that his consent was not voluntary. First, police do not have to inform an individual of his right to refuse to consent to a search. *U.S. v. Harrison,* 639 F.3d 1273 (10th Cir. 2011). Whether an individual was aware that he could refuse to consent is but one factor considered in the totality of the circumstances analysis of whether the search was voluntary. *Id.* Government actions are coercive when they imply an individual has no right to refuse consent to search. *Id.;see United States v. Collins*, 683 F.3d 697, 702 (6th Cir. 2012). Second, the consent form presented to Mr. Guillen in fact included language informing he that he did have the right to refuse consent and that he could consult with an attorney before or during

---

[7] For some reason not made clear by defense counsel, Defendant offers two legal theories for the allegedly illegal search: under the "trespass" doctrine and under the *Katz* doctrine, but the analysis is virtually the same under both. The traditional trespass-based analysis considers whether a physical trespass occurred, relying on the baseline established in the text of the Fourth Amendment which protects searches of persons, houses, papers and effects. However, it has been understood for a long while that Fourth Amendment violations are not limited to physical trespass. In *Katz v. United States*, the Supreme Court held that property rights "are not the sole measure of Fourth Amendment violations" and that the protection extends not only to the seizure of tangible items but also to the recording of oral statements. 389 U.S. 347 (1967); *see also Florida v. Jardines*, 569 U.S. 1, 8 (2013) (holding that use of a canine was a trespassory invasion of the curtilage which constituted a "search" for Fourth Amendment purposes). Thus, *Katz* would envision Fourth Amendment violations to include the broader concept of Fourth Amendment violations.

the search.  Mr. Guillen stated that he felt "rushed," but admitted that he had a full opportunity

to review the form and knew what he was signing.  Tr. at 454-55.

A.    Search of House

Defendant contends that Mr. Guillen did not have authority to allow a search of the

house, particularly of Ethan's bedroom, in which he had an expectation of privacy.

The Fourth Amendment permits a warrantless search when one occupant sharing the

home with other parties consents. *United States v. Matlock*, 415 U.S. at 170; *Fernandez v.

California,* 134 S.Ct. 1126, 1129 (2014) ("police officers may search jointly occupied premises

if one of the occupants consents").   A third party has authority to consent to a search of property

if that third party has either (1) mutual use of the property by virtue of joint access, or (2) control

for most purposes over it. *U.S. v. Rith,* 164 F.3d 1323 (10th Cir. 1999).  However, that same

search is unconstitutional when another occupant of the home is present and expressly refuses

consent.  *Georgia v. Randolph*, 547 U.S. 103 (2006); *U.S. v. McKerrell*, 491 F.3d 1221 (10th Cir.

2007) (no Fourth Amendment violation where defendant did not expressly object to a search of

the house while he was on the scene, and there was no showing that the officers removed the

defendant from the scene to avoid his possible objection to the search); *United States v.

McKerrell*, 491 F.3d 1221, 1227 (10th Cir. 2007) (An occupant who does not wish the search to

occur must expressly object in order to nullify a co-tenant's express consent).

The analysis for actual or apparent authority is similar and the Government bears the

initial "burden of proving by a preponderance of the evidence that the consenter had mutual use

of the property searched by virtue of [his] joint access to it, or control for most purposes over it."

*United States v. Rith*, 164 F.3d 1323, 1329 (10th Cir. 1999)). As part of this fact-intensive

inquiry, there is a "normative inquiry" dependent on whether the relationship between the

defendant and the third party "is the type which creates a presumption of control for most purposes over the property by the third party." This presumption may be rebutted by facts showing an agreement or understanding between the defendant and the third party that the latter must have permission to enter the defendant's room. *Rith*, 164 F.3d at 1331. However, if the relationship creates a presumption of control and is unrebutted, then the third party has authority to consent to a search of the property. *Id.* at 1330 (while there were insufficient factual findings that defendant's parents had joint access to his bedroom, and no findings that the parents visited with defendant in his room, cleaned his room, or otherwise went into Rith's room uninvited, there was also a presumption that defendant was living with his parents and was not paying rent, and that this presumption was unrebutted).

The Government contends that Mr. Guillen had apparent authority to consent for the search of his home, starting out with a presumption of control that exists when a child lives with a parent. In such a situation, the parent generally has control over the property and therefore actual authority to consent to a search of the entire home. *United States v. Romero*, 749 F.3d 900, 905–06 (10th Cir. 2014). Ethan lived with his father, and so this relationship establishes the presumption that Mr. Guillen had actual authority to consent to a search of the home and its curtilage. *See Rith,* 164 F.3d at 1331 (control test is satisfied on a showing that a child lives with parents even when the child is an adult). The Government argues that it was therefore reasonable for the officers to rely on the presumption that Mr. Guillen had joint access or control over the entire home, including Ethan's bedroom. *Romero*, 749 F.3d 900, 907 ("when officers know facts creating a presumption of authority to consent, the officers need not make further inquiry into authority unless they learn additional facts (such as that the stepson pays rent) that may undermine the presumption."). In this case, the officers would not have recognized that the

bedroom Ethan occupied was the master bedroom which a parent typically occupies; and finally, the bedroom was open at the time the agents entered the premises. The facts in this case support the existence of a presumption that Mr. Guillen had authority and control for most purposes over the residence:

- Neither Defendant nor Tyler paid rent to live at the father's house, despite the fact that both brothers were over 18 years old.
- Ethan occupied the master bedroom in the house, and it is reasonable to assume that Mr. Guillen, and not Ethan, would have occupied that bedroom. No one told SA Rominger that the master bedroom was used by Ethan until after the search had been ongoing. Mr. Guillen did not advise the agents about this arrangement, either.
- Defendant's father stored items in a closet in the master bedroom; Tyler used a weight bench that was in the master bedroom as well.
- The master bedroom also contained items associated with Mr. Guillen's profession as a musician, such as a microphone and stand. Tr. at 41.
- None of the three Guillens limited where law enforcement could look.
- All of the bedrooms in the house, except for the grandmother's bedroom, were similarly all very messy and had big screen TV's. There was no indication that one room might have been used by one of the sons as opposed to the father.

Defendant attempts to rebut this presumption by pointing out that Mr. Guillen lacked joint access over Ethan's bedroom because he did not visit with Ethan in his room, did not clean his room and did not otherwise go in his room uninvited. There was testimony that several years ago Mr. Guillen had agreed to install a door with a locking knob on the master bedroom to ensure Ethan's privacy. Tyler described Ethan as being a private person who was in the habit of locking his bedroom door, and stated that Ethan used two types of door lockers that would block the door from being opened. Tyler recalled that Mr. Guillen would ask Ethan's permission before going into the master bedroom. Tr. at 354-358. Mr. Guillen testified that Ethan's door-locking created friction between them and in 2015 or 2016, he came to a compromise with Ethan by allowing Ethan to use other door locks with the understanding that if he knocked on the door,

Ethan would come out "without any squabble." Tyler was aware of this agreement. Tr. at 416-417.

Ethan's mother, Ms. Valdez, testified at the hearing. She said that when Ethan was staying with her, he was in his bedroom so often that she had to make a rule that he had to eat in his room and that other than leaving his room for necessities and to go to school, Ethan did not leave his bedroom. Since her divorce from Ethan's father in 2005, the parents split custody of Ethan and Tyler when they were ages 6 and 8 and each parent made special arrangements to respect Ethan's privacy in his bedroom when he was living with them. When Ethan went to live with his father, Mr. Guillen allowed Ethan to have the master bedroom in the house. Ms. Valdez corroborated the arrangement Ethan had with his father at the Guillen residence where he was currently living. Tr. at 484-487.

The Court assumes that testimony of Mr. Guillen, Tyler and Ms. Valdez to be credible, but this testimony is insufficient to rebut the presumption of control which the Government has established belonged to Mr. Guillen. What is critical here is that even if Ethan had an expectation of privacy in the master bedroom, the agents conducting the search had no reason to assume that Ethan, rather than his father, was using the master bedroom, nor did they have any way of knowing about the agreement Ethan had with his family, particularly his father, regarding maintaining that privacy. In *U.S. v. Romero,* 743 F.Supp.2d 1282 (D.N.M. 2010), *aff'd,* 749 F.3d 900 (10th Cir. 2014), the court found that defendant's stepfather lacked actual authority to consent to a search of defendant's bedroom, where there was a locking mechanism on bedroom door and the stepfather never went into that bedroom, but the court also found that the stepfather had apparent authority to consent to the search because agents knew that stepfather was an occupant and the likely owner of the house and that defendant might also reside there, and the

agents were also unaware that the bedroom door had a locking mechanism. Here, while Mr. Guillen consented to the search of the house, he never informed law enforcement about a special agreement he had with Ethan regarding access to the bedroom, nor did he limit the physical search of the bedroom in any way.

In this case, then, it seems clear that Mr. Guillen had at least apparent authority to consent to the search of the residence because he had control over the house for most purposes, and thus the agents reasonably assumed that Mr. Guillen had this authority. *See Illinois v. Rodriguez,* 497 U.S. 177 (1990) (holding that Fourth Amendment is not violated when officers enter without a warrant if they reasonably, albeit erroneously, believe that the third party has authority to consent to the entry). First, Ethan may have kept his bedroom locked when he was not in the room, but on that night of the search, Ethan and his brother were together in the master bedroom when agents arrived and they left the door of the room wide open. Second, because Mr. Guillen used the closet in that bedroom to store seasonal clothing and professional musical equipment, it would appear to the agents as though an adult was using the master bedroom— which itself was a reasonable presumption for agents to make. Third, Ethan did not object to the search at any time. *See U.S. v. Pena*, 920 F.2d 1509, 1515 (10th Cir. 1990) (holding that a defendant's failure to object is a good indicator that consent existed); *United States v. Guerrero*, 472 F.3d 784, 790 (10th Cir. 2007) (failure to object during search, while not dispositive, is often a good indicator that consent existed). As the Government points out, even if Ethan shared common authority with his father to consent to a search of the home, such common authority to consent does not require both parties to consent in order for the search to be valid. *Id.* at 133; *see also U.S. v. McKerrell*, 491 F.3d 1221, 1227 (10th Cir. 2007) (an occupant who does not wish

the search to occur must expressly object in order to nullify a co-tenant's express consent) (search context).

Having found that Mr. Guillen had apparent authority to consent to the search of the house, including the master bedroom which Ethan occupied, there is no need to address whether he also had actual authority. *See, e.g., Rith,* 164 F.3d at 1331, n.5 (finding it unnecessary to determine whether Rith's parents had apparent authority to consent to the search of his bedroom because they had actual authority). Therefore, the agents did not violate Ethan's Fourth Amendment rights in carrying out the search of the Guillen residence.

## III.    The *Miranda* Issue-Relevant Law

Defendant argues that his Fifth Amendment rights were violated because law enforcement officers failed to advise him of his rights under *Miranda v. Arizona,* 384 U.S. at 136, 477-78 (1966) when he was a suspect, in their custody and was subject to their interrogation. Specifically, Defendant claims that he made incriminating statements to the agents before being advised of his *Miranda* rights—midstream in his confession.

Ethan made his initial self-incriminating statement prior to his being advised of his rights. However, even assuming a procedural Fifth Amendment violation, wholesale suppression of Ethan's statements to law enforcement is not constitutionally required. The United States Supreme Court has recognized that "custodial statements made prior to delivery of *Miranda* warnings do not necessitate exclusion of any subsequent confession." *Oregon v. Elstad*, 470 U.S. 298, 318 (1985); *U.S. v. Pettigrew,* 468 F.3d 626, 635 (10th Cir. 2006) (citing *Elstad* at 316); *Rith,*164 F.3d at 1332-1333.

In *Elstad,* the Supreme Court held that a suspect who has once responded to unwarned yet uncoercive questioning "is not thereby disabled from waiving his rights and confessing after

he has been given the requisite *Miranda* warnings." 470 U.S. at 318. In that case, police officers went to the defendant's home and questioned him about a burglary without first reading him the *Miranda* warnings. *Id.* at 301. The defendant admitted being present at the burglary, at which point the officers took him to the police station. *Id.* An hour after arriving at the station, the officers informed the defendant of his *Miranda* rights. *Id.* The defendant then waived those rights and gave a full statement detailing his role in the crime. *Id.* at 301–02. The court held that "[t]hough *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made." *Id.* at 309. The court rejected the theory that the initial, unwarned statement creates a "lingering compulsion" based on "the psychological impact of the suspect's conviction that he has let the cat out of the bag and, in so doing, has sealed his own fate." *Id.* at 311. Instead, the Supreme Court concluded that the subsequent administration of *Miranda* warnings after a voluntary but unwarned custodial confession will "remove the conditions that precluded admission of the earlier statement." 470 U.S. at 314. In other words, statements made after a voluntary *Miranda* waiver could be admissible as long as the pre-*Miranda* statements were also uncoerced. *Elstad,* 470 U.S. at 318.

The Supreme Court revisited this issue in *Missouri v. Seibert,* 542 U.S. 600 (2004) which concluded that *Miranda* warnings given mid-interrogation, after defendant gave an unwarned confession, were ineffective, and thus the confession repeated after warnings were given was inadmissible at trial. *Missouri v. Seibert*, 542 U.S. 600 (2004). In *Seibert*, the police were investigating a murder by fire. Patrice Seibert feared charges of neglect when her son, afflicted with cerebral palsy, died in his sleep. She was present when two of her sons and their friends discussed burning her family's mobile home to conceal the circumstances of her son's death.

Donald, an unrelated mentally ill 18–year–old living with the family, was left to die in the fire in order to avoid the appearance that Seibert's son had been unattended. Officers arrested Seibert at 3:00 a.m. Officers took Seibert to the police station where she was left alone in an interview room for 15-20 minutes. *Id.* at 604-605. An officer then questioned her for 30-40 minutes, while squeezing her arm and repeating "Donald [the victim] was also to die in his sleep." *Id.* Seibert finally admitted her crime. She was then given a 20-minute coffee and cigarette break. Then, the officer turned on a tape recorder, advised Seibert of her rights, and obtained a signed waiver of rights from her. He then resumed the questioning and confronted her with her pre-warning statements. Seibert then made incriminating statements. Seibert sought to exclude both her pre-warning and post-warning statements. At the suppression hearing, the officer testified that he made a conscious decision to withhold *Miranda* warnings, using a technique that he had been taught- question first, then give the *Miranda* warnings, and then repeat the question until he receives the answer he had already been given. *Id.* at 605-606. The Supreme Court determined that this police strategy was "adapted to undermine the *Miranda* warnings," and held that Seibert's post-warning statements were inadmissible. *Id.* at 616-617.

Defendant urges this Court to apply *Seibert* here, suppressing both the pre-warning and post-warning statements made by Ethan. The problem in trying to apply *Seibert* to any set of facts is that, as the Tenth Circuit has noted more than once, determining the actual holding in *Seibert* "is not easy in light of the fragmented nature of the opinion." *United States v. Carrizales-Toledo*, 454 F.3d 1142, 1151 (10th Cir. 2006); *see also U.S. v. Sanchez-Gallegos*, 412 F. App'x 58, 72 (10th Cir. 2011). This is because none of the opinions by Justices in *Seibert* received a majority vote of five Justices. Justice Kennedy, for example, concluded that the admissibility of post-warning statements "should continue to be governed by the principles of

[*Elstad*].  542 U.S. at 622. However, *Seibert* does have a plurality opinion which was joined by four of the Justices, holding that "[t]he threshold issue when interrogators question first and warn later is . . . whether it would be reasonable to find that in these circumstances the warnings could function 'effectively' as *Miranda* requires." Id. at 611–12.

The plurality in *Seibert* set forth five "relevant facts that bear on whether Miranda warnings delivered midstream could be effective": (1) the completeness and detail of the questions and answers in the first round of interrogation, (2) the overlapping content of the two statements, (3) the timing and setting of the first and the second, (4) the continuity of police personnel, and (5) the degree to which the interrogator's questions treated the second round as continuous with the first.  542 U.S. at 615.

The Tenth Circuit has generally applied both the plurality's five-factor test in *Seibert* as well as *Elstad's* voluntariness inquiry (contained also in Justice Kennedy's concurrence in *Seibert)* when considering the issue of the admissibility of statements made following unwarned self-incriminating statements.  In other words, *Seibert* has not replaced *Elstad,* nor has *Elstad* been overruled by the Supreme Court.  *See, e.g., United States v. Pettigrew*, 468 F.3d 626 (10th Cir. 2006) (finding that "*Elstad's* underpinnnings were controlling); *U.S. v. Crip,* 371 F.App'x 925, 930 (10th Cir. 2010) (concluding that defendant's self-incriminating statements were admissible under either the *Seibert* plurality opinion, Justice Kennedy's concurring opinion in *Seibert* or the voluntariness test adopted by *Elstad*); *U.S. v. Carrizales-Toledo*, 454 F.3d 1142 (10th Cir. 2006) (finding that defendant's statements would be admissible under the tests proposed by both the plurality and the concurring opinion supporting *Elstad's* analysis).

The best approach to determining the admissibility of the pre-warning and post-warning statements therefore appears to be a two-part inquiry.  While *Seibert's* holding is not clear, as

discussed above, the plurality's five-factor test may be considered along with the *Elstad* analysis for voluntariness.[8]  First, however, the Court must determine whether Ethan was in custody prior to making the admission that he built the IED. If he was not in custody, then the self-incriminating statement is admissible as long as it was uncoerced, since the Fifth Amendment would not apply if Ethan was not in custody. *See United States v. Rith*, 164 F.3d 1323 (10th Cir. 1999) (defendant was not in custody when he made first inculpatory statement, precluding need to provide *Miranda* warnings); *United States v. Carloss*, 818 F.3d 988, 992 (10th Cir. 2016).  If, however, Ethan was in custody at the time he made the admission, then the agents committed a procedural *Miranda* violation, and that pre-warning statement would not be admissible. *See Elstad,* 470 U.S. at 309 (noting that *Miranda* requires that the unwarned admission must be suppressed). However, as explained above, under *Elstad,* statements made *after* a voluntary *Miranda* waiver could be admissible as long as the pre-*Miranda* statements were also uncoerced. *Elstad,* 470 U.S. at 318 (statements made after a voluntary *Miranda* waiver could be admissible as long as the pre-*Miranda* statements were also uncoerced); *U.S. v. Carrizales-Toledo*, 454 F.3d at 1149 ("[A]bsent deliberately coercive or improper tactics in obtaining the initial statement," the Court found that "subsequent administration of *Miranda* warnings . . . ordinarily should suffice to remove the conditions that precluded admission of the earlier statement.") (quoting *Elstad*, 470 U.S. at 314).

---

[8]  Without any further guidance from the Tenth Circuit, the Court would have to assume that if *Seibert* factors apply where it appears that the failure to read Ethan the Miranda warning was a strategy intended to undermine his constitutional rights, then Ethan's subsequent confession may not be admitted, whether or not the initial statements were voluntary.  Of course, if both the *Seibert* factors and the voluntariness inquiry come to the same result, then this situation is avoided.

Also, in the *Carrizales-Toledo* case, defendant's pre-warning statements would come even if he was in custody prior to being advised of his rights because of the "public safety" exception which allows a delay in issuing Miranda warnings.  454 F.3d at 1146.

The overriding concern in the analysis is whether the *Miranda* warning was sufficient to inform Ethan that he could choose whether to continue his confession.

## IV.    Analysis of the *Miranda* Issue – Custodial Interrogation

Custodial interrogation is defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Calif. v. Beheler,* 463 U.S. 11221, 1124 (1983);*Yarborough v. Alvarado*, 541 U.S. 652, 661 (2004).   Under *Miranda v. Arizona*, 384 U.S. 436 (1966), before any custodial interrogation, a defendant must be warned that he has the right to remain silent, that any statement he does make may be used as evidence against him, that he has the right to the presence of an attorney, and that if he cannot afford an attorney, one will be provided for him. *U.S. v. Erekson*, 70 F.3d 1153, 1156 n.1 (10th Cir. 1995).   Two requirements must be met before *Miranda* is applicable; the suspect must be "in custody," and the questioning must meet the legal definition of "interrogation." *United States v. Perdue*, 8 F.3d 1455, 1463 (10th Cir.1993); *United States v. Bennett*, 329 F.3d 769, 775 (10th Cir. 2003) (defendant not in custody where his freedom of action was not "curtailed to a degree associated with formal arrest" during questioning.).   Further, *Miranda's* "in custody" requirement" is measured objectively, the proper inquiry being whether a reasonable person in the suspect's position would have understood his situation as the functional equivalent of formal arrest.  *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984)) (quotation omitted); *U.S. v. Jones,* 523 F.3d 1235, 1239 (10th Cir. 2008) (whether a person is in custody for *Miranda* purposes is an objective determination).   This means that whether agents believe an individual is in custody is not dispositive, nor is the defendant's subjective belief.  *U.S. v. Bautista,* 145 F.3d 1140 (10th Cir. 1998).

Ethan contends that he was in custody during the questioning by agents at the Guillen residence; that agents used interrogation tactics designed to undermine the effectiveness of *Miranda* warnings; and that Ethan could not have made a voluntary, knowing and intelligent waiver of his *Miranda* rights. *Smith v. Mullin* 379 F.3d 919, 932 (10th Cir. 2004) (in order to be effective, a waiver must be made "voluntarily, knowingly, and intelligently") (citing *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). For a waiver to be knowing and intelligent, it "must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." The Government's position is that Ethan was not in custody until after he initially admitted to making the IED, and because he was not in custody, the *Seibert* factors do not apply.

A.      "Interrogation"

Police questioning constitutes interrogation, for the purposes of *Miranda,* when police ask questions or engage in actions designed to elicit an incriminating response from a person, or when police should know their questions or actions are reasonably likely to elicit such a response. *Rhode Island v. Innis,* 446 U.S. 291, 300–01 (1980). Such questions and actions are the "functional equivalent" of expressly questioning a person about their criminal liability. *Id.* at 300–01. An incriminating response is any response, whether inculpatory or exculpatory, that the prosecution may seek to introduce at trial. *Id.* at 302 n. 5. Custodial interrogation is also defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Calif. v. Beheler,* 463 U.S. 1121, 1124 (1983); *Yarborough v. Alvarado*, 541 U.S. 652, 661 (2004).

The evidence and testimony presented at the hearing are as follows—and these are not disputed: After the agents' entry into the house, SA Rominger went to sit with SA Greene and

Ethan at the kitchen table while the other agents spoke with Tyler in one of the hallways prior to Mr. Guillen's arrival at the house. Ethan denied being over at the victim's house or that he had anything to do with making the device. Ethan continued to deny involvement with making the IED until SA Rominger referred to certain objects that were relevant to the search efforts, explaining what was missing and what was found, namely, the missing pressure cooker, the burned table found outside the house in the back, the missing soldering iron and the white tape. Tr. at 119, 120, 145. SA Rominger stated that he "pushed him," using interrogation tactics in which he was trained, telling Ethan that the agents knew he had purchased a pressure cooker which was gone, that he had used his dad's soldering iron that was missing and white tape was found in his backpack. Tr. at 148-149. SA Rominger stated that after being confronted with this evidence and information, Ethan hesitated, took a breath, and told SA Rominger that he had made the device. Tr. at 148-150.

After Ethan admitted to creating the device, SA Rominger immediately advised him of his *Miranda* rights. Tr. At 69. SA Rominger acknowledged in his testimony that because Ethan had just admitted to committing a crime, he was no longer free to leave. After the *Miranda* rights were read to Ethan, a more extended detailed interrogation was conducted. Tr. at 158-159, 250-251. SA Rominger noted that Ethan's demeanor before and after he was given his *Miranda* rights "never changed" and that Ethan was calm and confident in his answers. Tr. at 70. He noticed that he initially seemed nervous but then settled in after a few questions, and was surprised how even-keeled Ethan was the entire time. *Id.;* Tr. at 52, 114-115, 118, 281-282. One of the video exhibits shows Ethan getting up from the table and sending some text messages while the agents were talking among themselves. Tr. at 60; Ex. 2, APD Lapel Video, Pt. 4).

After advising Ethan of his *Miranda* rights, SA Rominger asked Ethan to describe the device and how he got the device into his ex-girlfriend's house. Ethan provided this information that was "coming like a flood" for about a half hour. Tr. at 161. Ethan also stated that his intention was to kill the victim. Tr. at 343-344; Ex. 2 (APD lapel video, Pt. 6). He then consented to a search of his room and his computers. In the bedroom, Ethan showed the agents a backpack in his bedroom while walking the agents through the room, and he did not object to the backpack being taken. Tr. at 84.

The fact-specific analysis is a close one, but the Court finds that SA Rominger's questioning of Ethan at the time Ethan made his initial self-incriminating admission constitutes interrogation under *Miranda.* SA Rominger stated that he considered Ethan a person of interest and did not feel he was interrogating Ethan until after Ethan first admitted to making the device, and so did not consider advising Ethan of his *Miranda* rights before that point. However, as more information and evidence was discovered as a result of the search and the interviews with Ethan's family, SA Rominger pushed on, despite Ethan's repeated denials of involvement. At this point, when SA Rominger confronted Ethan with this collective information and evidence, both missing and located, the purpose of the questioning went beyond mere eliciting of information, to where the purpose of the questioning was to elicit an incriminating statement. Questions that are designed to elicit an incriminating response from a purpose are the "functional equivalent" of expressly questioning a person about their criminal liability, and Ethan's admission was exactly the kind of response that the prosecution would seek to introduce at trial in this case. *Rhode Island v. Innis,* 446 U.S. at 300–01 (describing "interrogation").

Therefore, the Court finds that Ethan was being "interrogated" for purposes of *Miranda* when he made the initial self-incriminating admission.

B.  "Custody"

The determination of "custody," from an examination of the totality of the circumstances, is necessarily fact intensive." *United States v. Jones*, 523 F.3d 1235, 1240 (10th Cir. 2008); *U.S. v. Griffin,* 7 F.3d 1512, 1518 (10th Cir. 1993).  The analysis avoids hard-line rules  and is guided by several non-exhaustive factors, such as: (1) the extent to which the suspect is made aware that he or she is free to refrain from answering questions or to end the interview at will; (2) "the nature of questioning," which includes considering whether the questioning was prolonged and accusatory, and whether the questioning took place in a police-dominated atmosphere.

As an initial matter, the fact that Ethan was not specifically advised that he was at liberty to decline to answer questions or was free to leave is a "significant indication of a custodial detention."  *Griffin,* 7 F.3d at 1518; *U.S. v. Zarr,* 790 F.3d 1036, 1046 (10th Cir. 2015 (one factor to consider when determining whether an individual is in custody is whether the suspect was aware that he could refrain from answering questions or end the interview at will.   However, this factor is not dispositive.  *See U.S. v. Rith,* 164 F.3d 1323, 1333 (10th Cir. 1999) ("That Rith was not advised of his constitutional right is not at all dispositive and is but one factor to consider among others. The totality of the circumstances leads to the conclusion that all of Rith's incriminating statements were voluntary.")

The length of interrogation was not prolonged; SA Rominger interrogated Ethan for 50 to 60 minutes before Ethan admitted that he made the device.[9] There were no raised voices or yelling and the interactions between the agents and Ethan appeared to be at least civil. *See Ex. 2,*

---

[9]  This time span was also confirmed at the hearing at which the parties presented closings, based on their supplemental briefs. Agents were at the house for a total of less than two and a half hours, arriving around 9:45 p.m. and all units having cleared the Guillen residence by 12:15 a.m.  Govt's Ex. 4 (time line).

APD lapel video Pt. 4 (SA Greene asking Ethan to go and sit at the table after Ethan admitted to making the destructive device); *see also* Tr. at 61.

The Government points out that Ethan's freedom of movement was not curtailed. He was allowed to take breaks and was able to move about the general area. As shown in one of the video exhibits, he was allowed to get up from the table during the questioning and to get a drink of water from the refrigerator and got up to the bathroom. Tr. at 39-40; 131. He was free to change his location during the discussions with SA Rominger, moving from the table to the couch, and to move about within those rooms. Tr. at 61. When Ethan admitted to making the bomb, he was on the couch. SA Greene came up behind the couch then and said "Ethan, let's go and sit at the table." Tr. at 143-144. SA Rominger testified that Ethan could have stayed on the couch during this interrogation if he wished. Tr. at 149-151.

SA Rominger testified that at the time law enforcement knew about the missing pressure cooker and soldering iron, and they had found the burnt table, he did not consider Ethan to be in custody, and that he was free to leave because he realized that the responses elicited from Ethan were "getting pretty close to probable cause at that point." Tr. at 66. He also stated that if Ethan had asked them to leave, the agents would have left, and Ethan had asked for the interview to stop, the agents would have stopped asking questions. Tr. at 47, 69. However, the Court is not convinced that SA Rominger and Greene would have stopped the interview and/or left the residence had Ethan requested either. SA Rominger intimated that he had every intention of continuing the interrogation once the agents began to confront Ethan with the mounting evidence and the information the agents had collected from the interviews of Ethan's family members:

Q.     And isn't one form of confrontation of a suspect to continue to question that suspect after even repeated denials? That's done, isn't it?

A.     Correct.

Q.      It's a pretty fundamental investigation technique; right?

A.      Right.

Q.      And you weren't leaving?

A.      We were still talking to him, correct.

Tr. at 121-122: 19-2.

It was at this point that the questioning became a custodial interrogation. The Court finds considerable guidance in a Tenth Circuit case where the facts are not dissimilar and where the Tenth Circuit found that the defendant was not in custody for *Miranda* purposes. In *U.S. v. Rith* (discussed above in the context of the search), two police officers were asking the 18 year-old defendant questions about whether he had hidden guns in the house, as his father had suspected. 164 F.3d 1323, 1329 (10th Cir. 1999). Rith's father had asked the officers to check the family home to ascertain if the guns that his son possessed were stolen. On consensual entry into the house, one officer spoke with Rith in the kitchen, told him that they had permission to be in the house and that they knew he had brought guns into the house, but Rith told the officers that he had only one gun, and it was in his bedroom. The officers searched Rith's bedroom and found a loaded shotgun. One of the officers returned to the kitchen and confronted Rith with the gun. Rith knew that it was illegal to possess a sawed-off shotgun and that the guns were probably stolen by the person who had given them to him. Another officer, who had found another gun in the garbage can outside, returned to the kitchen and read Rith his *Miranda* rights. Rith confirmed that he understood his rights and repeated that he knew that it was illegal to possess a sawed-off shotgun and that the guns were probably stolen. He was then arrested for possession of stolen property and illegal weapons. *Id*. at 1327.

Rith moved to suppress his pre-warning and post-warning statements. The Tenth Circuit agreed with the district court that Rith was not in police custody until the point at which he was confronted with the illegal shotgun. Like Rith, Ethan was questioned while at home with five officers present; the officers had authority to be there and the officers' questions were not harassing or especially prolonged. In both situations, the officers did not draw their weapons, handcuff or otherwise impose physical restraints; Ethan was not physically restrained until he was handcuffed and formally arrested.

The Tenth Circuit found that the point of no return for purposes of custody for Rith was the confrontation with the shotgun. 164 F.3d at 1332 (". . . under the totality of the circumstances, Rith was not in police custody until the point at which he was confronted with the illegal shotgun"). Similarly, although Ethan was not in custody for purposes of *Miranda* during SA Rominger's initial questioning, the Court finds that Ethan's status changed when the agent continued to press Ethan despite his repeated denials, and then confronted him with the information and evidence that had been collected during the search. The purpose of the questioning at that point was to elicit incriminating responses—not simply to obtain information. Also at that point, a reasonable individual in Ethan's situation, would have not felt free to walk out the door or end the interrogation, and thus Ethan was in custody when he told SA Rominger that he had made the device.

## V. The *Miranda* Issue – Voluntariness of Initial Statement and Waiver

Because Ethan was in custody when he admitted building the device to SA Rominger, *Miranda's* Fifth Amendment procedural safeguards were triggered and the unwarned self-incriminating statement must be suppressed. *See Seibert,* 542 U.S. at 600 (referring to "voluntariness standards central to the Fifth Amendment and reiterated in *Elstad*). However, as

explained above, under *Elstad,* statements made after a voluntary *Miranda* waiver could be admissible as long as the pre-*Miranda* statements were also uncoerced. *Elstad,* 470 U.S. at 318 ("Though *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made.").

A.    Voluntariness

Voluntary cooperation occurs when a defendant's statement is the product of his own free and independent will. *See United States v. Chalan*, 812 F.2d 1302, 1306-1307 (10th Cir. 1987). A statement is freely given when there is no physical or mental pressure, or threats or pressure used to coerce the defendant into giving a statement, based on a totality of the circumstances, looking both at the characteristics of the defendant and the details of the interrogation. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). The essence of voluntariness is whether the government obtained the statements by physical or psychological coercion such that the defendant's will was overcome. *See Miller v. Fenton*, 474 U.S. 104, 116-117 (1985). Five factors are considered: "(1) the age, intelligence, and education of the defendant; (2) the length of [any] detention; (3) the length and nature of the questioning; (4) whether the defendant was advised of [his or] her constitutional rights; and (5) whether the defendant was subjected to physical punishment." *U.S. v. Glover,* 104 F.3d 1570, 1580 (10th Cir. 1997); *Rith*, 164 F.3d at 1333.

Here again, the facts in the *Rith* case are analogous to this case. Ethan's detention and interrogation lasted no more than an hour, and so this factor does not support a finding of physical or psychological coercion (Rith's interrogation lasted no more than 45 minutes). In *Rith,* the Tenth Circuit noted that that the record contained no evidence to suggest that 18 year-old Rith was susceptible to coercion because of his age, intelligence, or education. *Rith,* 164

F.3d at 1333.  In this case as well, Ethan was 18, and had sufficient education and sophistication of intelligence not only to build the IED at issue in this case, but also to build his own computer. Tr. at 189. Also similar to *Rith,* Ethan and his family were voluntarily cooperating with law enforcement.  The agents were searching the Guillen home with the consent of the homeowner, Mr. Guillen, and without objection from Ethan himself.   There is no suggestion of any physical punishment that took place during any of the time law enforcement was in the Guillen residence. Therefore, the Court finds that Ethan's statements to law enforcement, both pre-warning and post-warning, were made voluntarily and were uncoerced.

Ethan's waiver of his *Miranda* rights must also be voluntary in order for his post-warning statements to be admissible.  In order to be effective, a waiver must be made "voluntarily, knowingly, and intelligently." *Miranda v. Arizona,* 384 U.S. at 444.  For a waiver to be knowing and intelligent, it "must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." *Smith v. Mullin,* 379 F.3d 919, 932 (10th Cir. 2004) ("Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived."); *U.S. v. Morris,* 287 F.3d 985, 989 (10th Cir.2002) (quoting *Colorado v. Spring*, 479 U.S. 564, 573 (1987)) (accord).

According to SA Rominger's testimony at the hearing, which the Court finds to be credible, Ethan indicated that he understood the *Miranda* warnings.  After being read those rights, Ethan never asked to stop the questioning or for an attorney.  He refused to answer only one question—whether he planned on making another device to attempt to kill the victim.  Tr. 74; 80-83.  This one refusal is one indication that Ethan understood what he was agreeing to and what he was giving up in continuing to speak with the agents following his waiver.

B.    Failure to Record Waiver

Defendant attempts to make an issue of the fact that neither Ethan's initial self-incriminating statement nor his *Miranda* waiver was memorialized in writing or by video or audio recording.   He suggests that this failure is a tactic "adapted to undermine" *Miranda's* effectiveness, and contends that the absence of a recording constitutes a failure of proof as to whether the agents conducted their investigation within the bounds of the Fifth Amendment. Doc. 63 at 17.[10]   Defendant refers to a District of New Mexico case in which United States District Judge Christina M. Armijo stated:

> The Court cannot require the United States to record interrogations. But if the United States fails to record interrogations, it must bear the consequences in cases such as the present where the actual words employed by the participants, their tone of voice, and their body language are necessary factors in the Court's voluntariness analysis."

966 F.Supp.2d 1180, 1186 (D.N.M. 2013).   At the hearing, SA Rominger explained that the recorder he customarily used for interview purposes ran out of batteries.   As a result, he recorded witness interviews with his phone, but by late evening the battery on his phone was dead and so after that point he did not record any other interviews, including that of Defendant.

The Government disagrees with any untoward inference from the lack of a recording, explaining that the recorded SA Rominger customarily used ran out of batteries.   It is true that the Fifth Amendment does not require the recording of post-arrest statements.  *See United States v. Yunis*, 859 F.2d 953, 961 (D.C.Cir. 1988) ("There is no constitutional requirement that confessions be recorded by any particular means.").   On the other hand, a video recording of Ethan's pre-warning statement and *Miranda* waiver would have been most helpful in resolving the more equivocal issues raised in this case. However, the Court will not make any negative

---

[10] Det. Larranaga's lapel camera did record a nine-minute video segment of Ethan's post-warning statements, explaining how he built the IED.

inferences regarding the voluntariness of the confession simply because certain portions of the interview were not recorded, and thus finds that Ethan's pre-warning and post-warning statements to law enforcement, and his *Miranda* waiver, were made voluntarily.

## VI.    *Seibert* Five-Factor Test

Defendant contends that the situation here mirrors that in *Seibert,* where the agent took defendant's confession, advised Seibert of her *Miranda* rights, and then had defendant repeat the information she had just given.[11]    The Court finds that the facts here do not line up in Defendant's favor as they did in *Seibert*.

### A.    Completeness and Detail of First Round of Interrogation

The police officer in *Seibert* questioned defendant for 30 or 40 minutes at the police station (where defendant was clearly in custody for *Miranda* purposes), obtaining a full confession by Seibert of her plan to avoid the appearance that her son had been unattended when he died.  Ethan was questioned for 18 minutes in his own home.   Thus, SA Rominger's questions were not the kind of "systematic" or "exhaustive" interrogation that would thwart the purpose of a subsequent *Miranda* warning. *See Seibert,* 542 U.S. at 616 (noting that "the questioning was systematic, exhaustive, and managed with psychological skill" and lasted for thirty to forty minutes), cited in *U.S. v. Crisp*, 371 F. App'x 925, 930 (10th Cir. 2010); *U.S. v. Carrizales-Toledo*, 454 F.3d 1142 (10th Cir. 2006) (brevity and spontaneity of officer's initial questioning reduced likelihood that it undermined subsequent *Miranda* warnings).  Thus, this first factor weighs in favor of admissibility of Ethan's post-warning statements.

### B.    Overlapping Content of the Two Statements

---

[11]  The Government did not offer an analysis under the five-factor *Seibert* test because its position is that Ethan was not in custody at the time he made his initial admission, and thus *Miranda* warnings were not required.

Under the next *Seibert* factor, the Court considers whether the post-warning statement overlapped the information given in the pre-warning statement, or whether the post-warning statement provided significant new information. In *Seibert,* the interrogating officers covered the same ground in both rounds of questioning, which the plurality believed could aggravate "any uncertainty on [the suspect's] part about a right to stop talking about matters previously discussed." *U.S. v. Carrizales-Toledo*, 454 F.3d at 1152 (citing *Seibert,* 542 U.S. at 616). Here, however, SA Rominger immediately advised Ethan of his *Miranda* rights when he made the initial self-incriminating statement that he had created the device. The information that Ethan provided after he received the warning was different from his pre-warning admission in that he began describing to SA Rominger how he made the device and what components he used. *Cmp. Carrizales-Toledo,*454 F.3d at 1142 (second *Seibert* factor not met where defendant provided "significant new information" to the agent during the second questioning, including where he received the marijuana, what he was paid for transporting it, and his intended destination). This factor also weighs in favor of the admissibility of Ethan's post-warning statements.

C.      Interrogation Environment and Continuity of Personnel

The third and fourth *Seibert* factors consider the timing and setting of the first and the second interrogations and the continuity of police personnel. These factors weigh against the admissibility of Ethan's post-warning statements because the first and second rounds of questioning occurred in the same location and continued with SA Rominger and SA Greene. *See, e.g., U.S. v. Aguilar,* 384 F.3d 520, 525 (8th Cir. 2004) (holding that *Seibert* third factor cut in favor of finding a *Miranda* violation where the defendant's two interrogations occurred in the same room), cited in *U.S. v. Crisp,* 371 F. App'x 925, 930–31 (10th Cir. 2010).

D.      Continuity of Second Round

The final *Seibert* factor is the degree to which the interrogator's questions treated the second round as continuous with the first. In *Seibert,* the plurality expressed concern about officers in the second interrogation referring back to the confession already given, believing that such references create the impression that the second interrogation is a "mere continuation" of the first, and that it would be "unnatural" for the suspect "to refuse to repeat . . . what had been said before." *Carrizales-Toledo,* 454 F.3d at 1152 (citing *Seibert,* 542 U.S. at 616-17). This factor weighs more heavily supporting admissibility than against it. While the information elicited in the second round of questioning technically arose from Ethan's initial admission that he made the IED, the second interrogation focused on a different subject: the details of how the device was built and the reasons Ethan had for building it. There would have been little need for reference back to the initial admission. *Cmp. Carrizales-Toledo,* 454 F.3d at 1152 (fifth factor supported admissibility of post-warning statement where there was no evidence that the agents ever referred back to defendant's initial statements during the second interrogation).

Under this *Seibert* analysis, the Court finds that Ethan's post-warning statements are admissible. The two rounds of interrogation were not conducted in a way that could aggravate any uncertainty on Ethan's part about a right to stop talking about matters previously discussed. Ethan was advised of his *Miranda* rights immediately after he admitted to making the device, and before any further information or details were solicited or made. As a result, the *Miranda* warning that was issued to Ethan functioned effectively and therefore allows the admission of the post-warning statements.

## VII.    Unlawful Detention/Arrest

Defendant contends that Ethan was unlawfully detained when he was directed to the kitchen table and prevented from leaving the house or walking about the house without an escort.

*Terry v. Ohio*, 392 U.S. 1, 16 (1968)(a seizure occurs "whenever a police officer accosts an individual and restrains his freedom to walk away."). Defendant also argues that at the time that the officers seized him, that seizure was not supported by probable cause and it was therefore unreasonable. *Michigan v. Summers*, 452 U.S. 692, 700 (1981); *see Manzanares v. Higdon*, 575 F.3d 1135, 1144 (10th Cir. 2009) (there is probable cause if there is "reasonably trustworthy information that would lead a reasonable officer to believe that the person about to be [seized] has committed or is about to commit a crime").

Ethan's detention was based on a collection of the following information, facts and evidence gleaned from the agents conversations with Tyler, Ethan and Mr. Guillen in initial consensual conversations:

1. Mr. Guillen had purchased a pressure cooker for Ethan;
2. The pressure cooker was missing;
3. Mr. Guillen's soldering iron was missing;
4. The soldering iron owned by Mr. Guillen appeared to be of the type and style used in the IED;
5. A table located in the backyard had several burn marks and a piece of fuse stuck on it.

There are several flaws with Defendant's argument. First, it is premised on an assumption that the agents' entry into the home was unlawful so that any evidence obtained subsequently must be suppressed. *See U.S. v. Harris,* 313 F.3d 1228 (10th Cir. 2002). The Court has found that the agents' entry into the house was lawful, and that both Tyler and Mr. Guillen voluntarily cooperated with the agents in the discussions they had. Second, Ethan was not in custody after the agents first entered the house or for most of the interrogation period. He was not in custody until SA Rominger pushed the interrogation harder and confronted Ethan with all the incriminating evidence and information that had been gleaned from the search and the interviews. Until that time, Ethan had been voluntarily cooperating with law enforcement. Third,

by the time law enforcement had gathered information from Tyler and Mr. Guillen and found the table in the backyard with burn marks, there was sufficient reason to detain Ethan further and thus the detention was lawful. Finally, after Ethan admitted to making the device, together with the evidence and information obtained by that time, probable cause existed to arrest him. As a result, the Court finds that Ethan was not unlawfully detained or arrested.

## VIII.   Suppression of Evidence

Defendant seeks to suppress both the evidence collected from the Guillen home as well as any statements made by Mr. Guillen.[12] This argument is based on the unlawfulness of the officers' entry into the home and the search of the residence, and thus any evidence obtained is the "fruit" derived from an unlawful entry and search and must be suppressed.   Again, Defendant's argument fails because the Court has found that both the entry and the search were lawful.   Therefore, neither Mr. Guillen's statements nor any evidence obtained from the search must be suppressed and Defendants' motion is denied on that ground.

### CONCLUSION

The purpose of a suppression hearing is "to determine preliminarily the admissibility of certain evidence allegedly obtained in violation of defendant's rights under the Fourth and Fifth Amendments." *United States v. Merritt,* 695 F.2d 1263, 1269 (10th Cir.1982). "The proper inquiry is whether [the challenged action] violated the Fourth Amendment rights of [the] criminal defendant making the challenge." *United States v. Allen,* 235 F.3d 482, 489 (10th Cir.2000) (quoting *United States v. Erwin,* 875 F.2d 268, 270 (10th Cir.1989) (paraphrasing in original)). "The proponent of a motion to suppress has the burden of adducing facts at the

---

[12]   As discussed earlier, courts have rejected the application of "fruit of the poisonous tree doctrine" to *Miranda* violations, making it clear that a failure to administer *Miranda* warnings, without more, does not automatically require suppression of the "fruits" of the uncounseled statement.  *U.S. v. McCurdy,* 40 F.3d 1111, 1117 (10th Cir.1994) (relying on *Oregon v. Elstad*, 470 U.S. 298, 305-06 (1985).

suppression hearing indicating that his own rights were violated by the challenged search."
*United States v. Eckhart,* 569 F.3d 1263, 1274 (10th Cir.2009) (quoting *Allen,* 235 F.3d at 489).
The controlling burden of proof at a suppression hearing is proof by a preponderance of the
evidence. *United States v. Matlock,* 415 U.S. 164, 177 n. 14 (1974). While the Court finds that
Defendant was in custody when he made the self-incrimination admission that he made the IED,
the Court also finds that Defendant has not met his burden that would result in suppression of
either the physical evidence found as a result of the search or the statements made by Mr.
Guillen. Defendant has met his burden with regard to Ethan's pre-warned admission, but not
with respect to Ethan's post-warned statements which are thus admissible.

The Court finds and concludes as follows:

(1) Both Ethan and Tyler consented to the agents' entry into the Guillen residence, and
Ethan did not object during the entry or subsequently to the agents' presence in the house;

(2) Mr. Guillen had apparent authority to consent to the search of the house, including the
master bedroom which Ethan occupied, and Ethan did not object to the search at any time.
Therefore, the agents did not violate Ethan's Fourth Amendment rights;

(3) Ethan was in custody for purposes of *Miranda* when he first admitted to making the
IED, in violation of Ethan's Fifth Amendment rights, but he was not in custody prior to that
time;

(4) Ethan's statements to law enforcement, including his initial admission, were made
voluntarily and were uncoerced, and thus his waiver of *Miranda* rights was voluntary, intelligent
and knowing. Therefore, while Ethan's pre-warned statement must be suppressed, his post-
warned statements are admissible under *Oregon v. Elstad*, 470 U.S. 298, 318 (1985) and
*Missouri v. Seibert,* 542 U.S. 600 (2004);

(5) Ethan was not unlawfully detained or arrested in violation of his Fourth Amendment rights; and finally,

(6) Because the entry and search were lawful, neither Mr. Guillen's statements nor any evidence obtained from the search must be suppressed and Defendants' motion is denied on that ground.

**THEREFORE,**

**IT IS ORDERED** that Defendant's motion to Suppress Evidence and Statements Discovered as a Result of Unlawful Search and Seizure (**Doc. 31**) is GRANTED only to the extent that Defendant's initial self-incriminating statement to law enforcement is suppressed, but the motion is DENIED on all other grounds for the reasons set forth in this Memorandum Opinion and Order.

_____
CHIEF UNITED STATES DISTRICT JUDGE